## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **LANESSA L. GRAHAM,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. CIV-24-884-HE** |
| ) | |
| **LELAND DUDEK,** ) | |
| **Acting Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.[1]** ) | |

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's application for benefits under the Social Security Act. The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. _____). This matter has been referred to the undersigned magistrate judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B)-(C). The parties have briefed their positions, and the matter is now at issue. It is recommended that the Commissioner's decision be **REVERSED AND REMANDED**.

---

[1] Leland Dudek became the Acting Commissioner of Social Security Administration on February 18, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.    PROCEDURAL BACKGROUND

Initially and on reconsideration, the Social Security Administration ("SSA") denied Plaintiff's application for benefits. Following an administrative hearing, an Administrative Law Judge ("ALJ") issued an unfavorable decision. (TR. 15-24). The Appeals Council denied Plaintiff's request for review. (TR. 1-3).  Plaintiff filed an appeal with this Court and prior to briefing on the issues, the Court granted the SSA's request for voluntary remand and dismissal. (TR. 876-77); *Graham v. Comm'r of the Soc. Sec. Admin.*, No. CIV-22-5-SM (Order & Judgment March 10, 2022), ECF Nos. 8, 9.

On remand, the Appeals Council instructed the ALJ to "[f]urther evaluate the claimant's alleged symptoms, including related to her interstitial cystitis, and provide rationale in accordance with the disability regulations and Rulings pertaining to evaluation of symptoms (20 CFR [§] 404.1529; and Social Security Rulings 15-1p and 16-3p)." (TR. 869). Following two administrative hearings (TR. 820-44, 845-66), the ALJ again issued an unfavorable decision. (TR. 799-810). Because this matter was previously remanded by the Court, the decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(a).

## II.    THE ADMINISTRATIVE DECISION

The ALJ followed the five-step sequential evaluation process required by agency regulations. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); 20 C.F.R. § 404.1520. At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since March 24, 2019, the alleged disability onset date. (TR. 802). At step two, the ALJ determined Plaintiff suffered from the following severe impairments:

interstitial cystitis ("IC") and fibromyalgia. (*Id.*). At step three, the ALJ found Plaintiff's impairments did not meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (TR. 803).

At step four, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR [§] 404.1567(a) with the following exceptions: She can never climb ladders, ropes, or scaffolds. She can occasionally climb stairs/ramps, balance, kneel, crouch, crawl, and stoop.

(TR. 804).

The ALJ presented the RFC limitations to a vocational expert ("VE") to determine whether Plaintiff can perform her past relevant work and the VE testified that Plaintiff could perform her past relevant work as a title clerk, title abstractor, and title assistant. (TR. 836). Presuming the same RFC, the VE identified three additional jobs in the national economy from the Dictionary of Occupational Titles that Plaintiff can perform. (TR. 836-37) The ALJ then adopted the VE's testimony and concluded Plaintiff was not disabled based on her ability to perform her past relevant work and the identified additional jobs. (TR. 808-10).

## III.   ISSUES PRESENTED

On appeal, Plaintiff raises two issues. First, Plaintiff contends the ALJ failed to conduct a proper consistency analysis of Plaintiff's subjective reports of IC symptoms, as required by Social Security Ruling ("SSR") 15-1p, *Titles II and XVI: Evaluating Case Involving IC*, 2015 WL 1292257. (ECF No. 4:8-12). Second, Plaintiff argues the ALJ erred

by failing to perform a function-by-function assessment, as allegedly required by SSR 96-8p. (ECF No. 4:28-30).

## IV.    STANDARD OF REVIEW

This Court reviews the Commissioner's final decision "to determin[e] whether the Commissioner applied the correct legal standards and whether the agency's factual findings are supported by substantial evidence." *Noreja v. Comm'r, SSA*, 952 F.3d. 1172, 1177 (10th Cir. 2020) (citation omitted). Under the "substantial evidence" standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019). "Substantial evidence . . . is more than a mere scintilla . . . and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (internal quotation marks omitted).

While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (internal quotation marks omitted).

## V.    SOCIAL SECURITY RULING GOVERNING IC CONSIDERATION

SSR 15-1p provides ALJs "guidance on how we develop evidence to establish that a person has a medically determinable impairment of [IC], and how we evaluate IC in disability claims." SSR 15-1p, 2015 WL 1292257, at *1. It explains that IC "is a complex genitourinary disorder involving recurring pain or discomfort in the bladder and pelvic region." *Id.* at *2. It can be the basis for a finding of disability when accompanied by

appropriate symptoms, signs, and laboratory findings. *Id.* at *4. SSR 15-1p describes IC symptoms as follows:

> IC symptoms may vary in incidence, duration, and severity from person to person, and even in the same person. For example, a woman's symptoms may worsen around the time of menstruation. Symptoms of IC include, but are not limited to:
>
> 1. Pain. People who have IC report chronic bladder and pelvic pain, pressure, and discomfort. This pain may range from mild discomfort to extreme distress. The intensity of the pain may increase as the bladder fills and decrease as it empties. In addition to bladder and pelvic pain, people with IC may experience vaginal, testicular, penile, low back, or thigh pain.
>
> 2. Urinary urgency and frequency. People who have IC may report an urgent need to urinate (urgency) or a frequent need to urinate (frequency), or both. Some people with severe cases of IC may need to void as often as 60 times per day, including nighttime urinary frequency (nocturia) with associated sleep disruption.

*Id.* at *4. The Ruling goes on to explain that other symptoms may include "[s]uprapubic tenderness on physical examination," "[s]exual dysfunction," "[s]leep dysfunction," and "[c]hronic fatigue or tiredness," as well as "anxiety or depression associated with IC symptoms." *Id.* at *4, 5.

Chronic pelvic pain often associated with IC can affect an individual's "ability to focus and sustain attention on the task at hand." *Id.* at *8. "Nocturia may disrupt sleeping patterns and lead to drowsiness and lack of mental clarity during the day." *Id.* Urinary frequency can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night. "Consequently, some individuals with IC essentially may confine themselves to their homes." *Id.*

Treatment is directed toward symptom relief, and the response to treatment varies. *Id.* at *3. Treatments for IC include, but are not limited to, "[c]hanges in diet; physical therapy and pelvic floor strengthening exercises; stress management; bladder distention; bladder instillation; oral drugs, . . . ; transcutaneous electrical nerve stimulation; and surgery, such as substitution cystoplasty or urinary diversion with or without cystectomy." *Id.*

Because there are no specific objective medical tests or findings to diagnose IC, longitudinal clinical records serve to document the presence of signs and laboratory findings and limitations over time. *Id.* at *5. Such records are helpful because "symptoms, signs and laboratory findings of IC may fluctuate in frequency and severity and may continue over a period of months or years." *Id.* Thus, in considering the impairment related symptoms, an ALJ must analyze the intensity and persistence of the symptoms by considering longitudinal evidence. *Id.* In the context of IC, the ALJ will often have to provide an analysis of three particular symptoms: (1) urinary frequency; (2) bladder pain; and (3) pelvic pain. *Id.* at *8.

## VI.    ALJ'S CONSIDERATION OF PLAINTIFF'S SUBJECTIVE IC SYMPTOMS AND THE MEDICAL RECORD.

The Court's review of the ALJ's consideration of Plaintiff's subjective reports is guided by two principles. First, such "determinations are peculiarly the province of the finder of fact, and [the court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Second, "findings as to [subjective reports] should be closely and affirmatively linked to substantial

evidence and not just a conclusion in the guise of findings." *Id.* (citation and additional alteration omitted). It is well established that "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Hendron v. Colvin*, 767 F.3d 951, 955 (10th Cir. 2014) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)).

The process for evaluating a claimant's subjective reports of symptoms and functional limitations associated with IC is similar to the two-step process used for evaluation of symptoms generally. *Compare* SSR, 15-1p, 2015 WL 1292257, *with* SSR 16-3p, 2017 WL 5180304; *see also Allison v. Berryhill*, 2017 WL 3701688, at *7 (N.D. Ohio June 23, 2017) ("Part IV of [] SSR [15-1p] sets forth a two-step symptom evaluation process for IC, which largely mirrors the two-step process used in evaluating the credibility of all symptoms."). Generally, the framework for evaluating a plaintiff's subjective statements is the following:

> We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you.

20 C.F.R. § 404.1529(c)(4). Other factors the ALJ considers include daily activities, the location, duration, frequency, and intensity of symptoms, medication an individual takes

or has taken to alleviate pain or other symptoms, other measures an individual has attempted for relief of symptoms, and any other factors concerning an individual's functional limitations and restrictions due to symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8. "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." *Id.* at *8.

Notably, the ALJ may not cherry-pick through the evidentiary record in her consideration of Plaintiff's subjective reports, relying only on portions supporting a finding of nondisability. *See Kellams v. Berryhill*, 696 F. App'x 909, 915 (10th Cir. 2017) ("An ALJ may not 'pick and choose among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence.'" (quoting *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004)). This is especially true in light of SSR 15-1p's directive to consider the longitudinal record in evaluating IC and its symptoms. SSR 15-1p, 2015 WL 1292257, at *5.

In her decision, the ALJ summarized Plaintiff's subjective reports of symptoms and functional limitations as follows:

> In a May 2020 function report, the claimant alleged that she was unable to work because she had to go to the bathroom constantly and because of pain from her conditions and side effects of prescribed medications. In a subsequent report submitted in December 2020, the claimant alleged that, after delivering her baby in December 2019, she continued to have chronic pain, depression, medication side effects, and fatigue from lack of sleep. She alleged that she hurt 24/7 and got no type of relief. She could not be

on her feet or sit for very long periods due to pain and pressure on her bladder and pelvis. At the hearings on remand in May 2023 and March 2024, the claimant's testimony continued to reiterate issues with constant bladder and pelvic pain, chronic fatigue, back pain, depression, and anxiety. She testified that she left her job because of the need for bathroom breaks and because she could not sit or stand for very long.

(TR. 805) (internal citations omitted). The ALJ concluded that Plaintiff's reports "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (TR. 805).

## A. PRIOR WORK ACTIVITY

Immediately prior to her disability onset date, Plaintiff worked as a title assistant at a title insurance company. (TR. 804). In determining the extent to which a plaintiff has been engaged in substantial gainful activity and whether she is able to sustain such activity in the future, an ALJ is required to consider whether the plaintiff previously worked "under special conditions," or employer-provided accommodations. 20 C.F.R. § 404.1573(c) ("The work you are doing may be done under special conditions that take into account your impairment."). If so, the SSA may conclude the plaintiff does not have the ability to do substantial gainful employment. Special conditions or accommodations include, but are not limited to, situations in which the plaintiff "received special assistance from other employees," was allowed to work irregular hours or take frequent breaks, or "was permitted to work at a lower standard of productivity or efficiency than other employees" *Id.*

Upon becoming pregnant, Plaintiff's IC symptoms worsened significantly, to the point she was unable to urinate without self-catheterization. (TR. 805). As a result, Plaintiff decided to stop working in May 2019. Relying on Plaintiff's work as a title assistant, the ALJ concluded, "Despite [her] impairments, [Plaintiff] was able to work for years at substantial gainful activity levels." (TR. 805). In reaching this conclusion, however, the ALJ never acknowledged the accommodations Plaintiff's employer provided prior to her pregnancy for her IC symptoms.

As previously discussed, the ALJ concluded Plaintiff could perform sedentary work with a few limited physical exceptions. (TR. 804). Sedentary work requires an individual to be capable of sitting for approximately six hours "with a morning break, a lunch period, and an afternoon break at approximately [two]-hour intervals." SSR 96-9p, 1996 WL 374185, at *6. Plaintiff testified that to accommodate her IC symptoms, her employer allowed her to go to the bathroom more frequently than the standard two fifteen-minute breaks and lunch hour per day. (TR. 860). Additionally, in 2020, Plaintiff reported that while employed, she "missed a lot of work due to my [IC]," indicating another special condition. (TR. 244). This condition is particularly relevant as the VE testified that "[y]ou cannot miss more than two days per month on a consistent basis and maintain competitive employment." (TR. 838).[2]

---

[2] In her Opening Brief, Plaintiff also references an accommodation regarding her employer permitting her to sit with her feet up and her legs bent. (ECF No. 4:13) (citing TR. 44). While Plaintiff testified that she must often sit in this position to relieve pressure on her bladder, she did not indicate whether her previous employer allowed her to do so. (TR. 44-47).

The ALJ relied on Plaintiff's ability to perform substantial gainful activity "for years" prior to her onset date to support the finding that Plaintiff can do so now. The accommodations Plaintiff's employer provided to her clearly fall under the special conditions contemplated in 20 C.F.R. § 404.1573(c), requiring the ALJ to "consider the nature and extent of the accommodations and determine whether—despite those accommodations—[P]laintiff's past relevant work . . . constituted substantial gainful activity." *Strode v. Colvin*, No. 12-1279-CM, 2013 WL 4768064, at *4 (D. Kan. Sept. 4, 2013) (applying 20 C.F.R. § 404.1573(c)). Based on the decision, it does not appear the ALJ considered whether Plaintiff performed her title assistant job under special conditions and if so, how those conditions affected the determination of whether her work constituted substantial gainful activity.

## B. DAILY ACTIVITIES

Plaintiff also argues the ALJ mischaracterized the extent of her reported daily activities, ignoring the qualifications and limitations she consistently reported. (ECF 4:19-22). In *Sitsler v. Astrue*, 410 F. App'x 112, 117-18 (10th Cir. 2011), the Tenth Circuit Court of Appeals held that this type of selective and misleading review of Plaintiff's daily activities is impermissible. Therein, the claimant argued that the ALJ mischaracterized the extent of his daily activities, ignoring particular qualifications and limitations. *Id.* at 117. In discounting the plaintiff's subjective reports, the ALJ relied on the plaintiff's activities of daily living, stating that he could care for his personal needs, care for his small children, perform household chores, drive, and go shopping. *Id.* at 114. In contrast, however, the record reflected that the claimant had to have help in caring for his children, he only

made simple meals, his ability to perform household chores was limited to a few minutes, his shopping was limited, and he drove very little. *Id.* at 117. Noting that the ALJ's analysis was "selective and misleading," the court stated that "an ALJ cannot use mischaracterizations of a claimant's activities to discredit his claims of disabling limitations." *Id.* (citing *Talbot v. Heckler*, 814 F.2d 1456, 1462, 1464 (10th Cir. 1987)) (noting the ALJ improperly based conclusion that the claimant could do light work on a mischaracterization of his activities).

In reviewing Plaintiff's daily activities, the ALJ stated that in May 2020, Plaintiff reported that she spent a typical day caring for her infant daughter, taking care of pets, paying bills, making calls, attending appointments, shopping, and doing household chores, including cleaning, doing dishes, vacuuming, doing laundry, and mopping. (TR. 805) (citing TR. 216-23). She stated that Plaintiff also reported preparing meals, driving a car, and being independent with personal care tasks. Based on these reports, the ALJ concluded that Plaintiff "was quite functional . . . [contrary to] her allegations of totally disabling physical and mental symptoms." (TR. 805).

Significantly, however, the ALJ never acknowledged the qualifications Plaintiff clearly placed on her ability to participate in the referenced activities. Plaintiff reported that in addition to taking care of her infant daughter during the day, she did household chores but only if she was "not hurting too badly that day." (TR. 217). She explained that her husband completed the tasks she was unable to complete during the day due to her symptoms. She also stated that she did not sleep well due to experiencing constant pain. (TR. 217). With regard to preparing meals, she stated that she makes mostly frozen

meals that she can either put in the oven or fry. (TR. 218). She also explained that she does not travel for fear of being unable to find a bathroom in time. (TR. 222).

The ALJ stated that in December 2020, Plaintiff continued to report that she took care of her daughter, did laundry, prepared meals for herself and her daughter, walked, did yoga, and did low-impact exercises. (TR. 805-06) (citing TR. 244-49). Again, the ALJ did not discuss Plaintiff's additional reports at that time that place her activities in context. For example, with regard to doing laundry, Plaintiff explained that she tried to accomplish cleaning and laundry by breaking it up into smaller tasks throughout the day/week due to pain. (TR. 247) ("I usually do laundry once a day or every other day just one load because I can't do a lot at once due to the pain so I try to break it up as much as I can."). Plaintiff also explained that she when she prepares meals, she "tries to make something that lasts a few days so I don't have to be on my feet and in pain for so long." (TR. 247). Finally, regarding exercise, Plaintiff stated, "I cannot exercise like I want to due to my conditions. I cannot do anything high intensity. I can only walk, do yoga and some other low impact exercises but I also have to make sure I don't overdo it. It is also very hard to get motivated with all the pain, depression, and anxiety." (TR. 249).

In the same report, Plaintiff explained that she was in constant pain and it intensified when she urinated. (TR. 246). Afterward, she often had to sit down with her legs up to take pressure off her bladder due to the pain, which she described as "a torch in my urethra because it feels like my urethra and vagina are on fire." (TR. 246). At night, she slept with an ice pack between her legs and used a vaginal valium and/or marijuana tincture but her sleep remained frequently interrupted by pain or the need to urinate.

(TR. 246). She also reported that she did most of her shopping online. (TR. 247). When she did have to go to a grocery store, her husband accompanied her because he knew how difficult it was for her to accomplish. (TR. 247). Also, she never made plans the following day because she knew she would be in pain. (TR. 247-48).

Here, as in *Sitsler*, the ALJ mischaracterized the extent of Plaintiff's daily activities, ignoring numerous qualifications and limitations to which she testified and reported. Thus, the Court concludes the ALJ's reliance on Plaintiff's activities is flawed and does not provide substantial evidence to support her consideration of Plaintiff's subjective reports of IC symptoms.

### C.  MEDICAL EVIDENCE

Medical evidence remains relevant to the evaluation of the subjective reports of a plaintiff suffering from IC, but it must also be considered in the IC context, including that objective medical tests often show normal findings. In *Allen v. Astrue*, No. 6:11–CV–06322–KI, 2012 WL 4792412, at *9 (D. Or. Oct. 9. 2012), the court explained:

> [N]ormally medical evidence may be at least one relevant factor in determining the severity of the pain and its disabling effects. However, here, where the Social Security Administration's own guidance explains that IC is a diagnosis of exclusion, medical test results showing, for example, an unremarkable colonoscopy, mild findings on the cystoscopy and urethral dilatation procedure, normal appearing bladder, "completely benign" abdominal examination, and normal renal ultrasound, do not shed light on [the plaintiff's] credibility.

*Id.* (internal citation omitted). Additionally, evidence of medical treatment successfully relieving symptoms is relevant to the disability determination, and specifically, to a plaintiff's subjective reports. At the same time, however, symptom improvement must be

evaluated in the context of the overall diagnostic picture. *See Kari J. v. O'Malley*, No. 3:23-cv-00128-HRH, 2024 WL 1855108, at *8 (D. Alaska Apr. 29, 2024) (finding the ALJ erred by relying solely on periods IC symptoms improved rather than considering "the overall longitudinal record show[ing] a pattern of improvement after procedures and treatments, followed by an increase in symptoms and a need for more procedures and treatments").

In her decision, the ALJ concluded that since 2021, "treatment records reflect complaints of symptoms (including pelvic pain, diffuse joint pain [] worst in the shoulders and low back), and fatigue, [but] overall, they indicate that [Plaintiff's] physical symptoms have been fairly well managed with medication." (TR. 806) (internal citations omitted). A review of the medical record reveals that Plaintiff's urinary frequency may have been reasonably managed with medication, but substantial support for the ALJ's same conclusion regarding Plaintiff's consistent pain in her bladder, urethra, and pelvic region is lacking, and in any event, not included in the ALJ's decision.

The ALJ summarized Plaintiff's medical history prior to the onset date, stating that it "reflects a long history of chronic pelvic pain and recurrent urinary tract infections, and a diagnosis of [IC] in 2008. [Plaintiff] had extensive treatment including surgery (including a partial vaginectomy and advancement flap in 2010 and cystoscopy with hydrodistention and bladder instillation in 2016). She was also suspected to have fibromyalgia by 2017." (TR. 805). A more detailed discussion of this history reflects Plaintiff's ongoing reports of pain in multiple areas throughout her pelvic region and without documentation that this pain was managed with treatment.

On October 3, 2016, two weeks after her cystoscopy, hydrodistention, and bladder instillation, Plaintiff reported that while her bladder seemed to be emptying better, she was experiencing a flare up of symptoms including an increase in dysuria and bladder pain. (TR. 450). In September 2017, Plaintiff reported that a previously prescribed medication, Uribel, helped with bladder symptoms. (TR. 444). However, despite following a strict IC diet, thereby avoiding foods that tend to trigger or exacerbate symptoms, she continued to experience heaviness, burning, and urethral and back pain, all of which were worsened by standing. She also reported that her symptoms increased before, during, and after her menstrual cycle. (TR. 444).

In February 2019, Plaintiff reported "IC flare-type symptoms that [are] persistent every day despite taking the medications and following the IC diet. . . . She feels she is getting to the point where she would prefer not to eat anything, rather than eating and caus[ing] a flare of IC." (TR. 422). The physician recorded chronic IC, dysuria, urgent desire to urinate, nocturia, and vaginal irritation. (TR. 422).

The ALJ did not discuss the medical record from 2020, stating only that it was limited. (TR. 805). In October 2020, Plaintiff reported another IC flare up, including vestibulitis and pain during sexual intercourse. (TR. 739). Her physician prescribed, *inter alia*, oxycodone every four hours as needed for "acute pain c section and IC" and cyclobenzaprine three times daily for spasms. (TR. 742-43).

With regard to 2021, the ALJ summarized Plaintiff's medical appointments as involving "ongoing treatment and follow up of IC and fibromyalgia." (TR. 806). "At treatment visits in 2021, in contrast with her allegations of having to go to the bathroom

constantly, she typically reported urinary frequency every 2-4 hours. . . . Physical exams in 2021 typically showed the claimant to be in no distress with normal abdominal and other findings." (TR. 806). As previously established, normal examination findings are not atypical for patients suffering from IC, *see Allen*, 2012 WL 4802412, at *9, and the record does not reflect a containment of Plaintiff's pain related symptoms.

In January 2021, Plaintiff reported "urgency, frequency q 2-3 hrs, + dysuria, and nocturia 1-2x. . . . She will have urinary hesitancy when trying to start her stream then gets an instant pain right after the void. . . . She reports she has full body pain and constant fatigue, but not being able to sleep. She will on occasion take AZO which helps. Pt also gets some relief with Valium vaginal suppositories." (TR. 749). She also explained that she previously had to quit her job due to constant bladder pain. (TR. 749). The physician recommended pelvic physical therapy and Plaintiff agreed. (TR. 753).

The ALJ discussed Plaintiff's physical therapy, which occurred from March 2021 to August 2021, stating that Plaintiff "typically reported a reduction in her symptoms and improvement in her function since starting treatment." (TR. 806). Though this is an accurate description of at least one of Plaintiff's physical therapy appointments during this time (TR. 1153), this improvement was not constant nor did it last.

In February 2021, at the beginning of physical therapy, Plaintiff reported that her pain was deep, worsening, and constant. (TR. 768). She also explained that urination, eating the wrong food, daily activities, and sexual intercourse exacerbated her symptoms. She stated that resting with an ice pack between her legs helped alleviate her pain. (TR. 768). She also reported that she experienced a burning sensation after bowel

movements, sexual intercourse was painful throughout and she must use an ice pack between her legs afterward, she urinated every two hours, and two to three times per night, and her sleep was often disrupted by pain. (TR. 769). She had blood in her urine, dribbling after urination, trouble starting stream, and urgency. She explained that her best position for sleep is on her side with an ice pack between her legs. (TR. 769).

Near completion of physical therapy, Plaintiff continued to report constant burning, urinating every two to two-and-a-half hours, and waking two to three times per night to urinate. (TR. 1149). The physical therapist noted that although some of Plaintiff's symptoms improved overall, her "symptoms are likely being driven by an overactive pelvic floor" and recommended a pelvic floor assessment. He also stated that her progress was likely hampered by her depression and anxiety resulting from her conditions. (TR. 1149-50). The physical therapist was later unable to complete a pelvic floor assessment due to extreme vestibular skin irritation and Plaintiff experiencing pain. (TR. 1144-45). The discharge note indicated Plaintiff had made no progress toward the goal of improving sleep as evidenced by waking two to three times per night. (TR. 1143).

The ALJ also discussed Plaintiff's care with Dr. Benjamin Barenberg beginning in August 2022. (TR. 806) (citing TR. 1119-23). The ALJ stated that Dr. Barenberg referred her for pelvic floor therapy for her IC symptoms of painful urination, vaginal irritation, and burning, and prescribed Valium and Clobetasol. She also noted that at Plaintiff's next appointment, in November 2022, she reported that she had not picked up the Valium nor started physical therapy, and that the Clobetasol had not improved her symptoms. (TR. 806) (citing TR. 1115).

The ALJ did not discuss that in addition to IC, Dr. Barenberg also diagnosed Plaintiff with levator spasms. (TR. 1121-22). He explained this condition as follows:

> The pelvic floor is comprised of a group of muscles that support the organs in the pelvis and wrap around the urethra, rectum, and vagina in women. Coordinated contracting and relaxing of these muscles controls bowel and bladder functions. The pelvic floor must relax to allow for urination, bowel movements, and, in women, sexual intercourse.
>
> When these muscles are in spasm, voiding, intercourse and defecation can be affected: patients may feel as if they have to strain to empty their bladder or to have a bowel movement, and intercourse may become painful. The goal of treatment for pelvic floor muscle spasm ls to relax these muscles and avoid stressing them. Treatment usually combines strain avoidance, medications such as muscle relaxants, and physical therapy.

(TR. 1122).

Plaintiff began the recommended physical therapy in March 2023. (TR. 1138-41). She reported her primary concern as the "frequent urinary urge and burning that limits her ability to complete daily routines. [She] also describes pain in the suprapubic region. [Plaintiff] describes her goals for therapy as restoring the ability to walk by reducing urinary urgency." (TR. 1138). The ALJ noted Plaintiff's subsequent report of "improvement in her symptoms, functioning, and ability to walk." (TR. 807).

The physical therapist set Plaintiff's functional goals as including improving her urogenital pelvic floor tone so that she could relax her pelvic floor muscle for ten minutes, allowing her to void normally. (TR. 1140). During her last visit, she reported a seventy-five percent improvement in this regard. (TR. 1165). Another functional goal included improving Plaintiff's urogenital pelvic floor strength, enabling her to maintain continence

for seven hours to help improve her sleep. (TR. 1140). Plaintiff reported a fifty percent improvement in this regard. (TR. 1165).

The ALJ's remaining discussion of Plaintiff's 2023 medical record was limited to noting that in November, a physical examination was essentially unremarkable, showing Plaintiff to have normal gait and station. (TR. 807) (citing TR. 1180, 1211, 1212). These 'normal' examination findings hold little relevance to Plaintiff's IC symptom reports because as previously established, given the nature of IC, an unremarkable physical examination is not unusual. *Allen*, 2012 WL 4792412, at *9 ("[W]here a physician diagnosed IC, it was improper for the ALJ to question [the plaintiff's] subjective complaints because they were not consistent with the mild and normal findings in the medical record); *see also Carolyn C. v. O'Malley*, No. 1:23-cv-00359-LEW, 2024 WL 3517817, at *3 (D. Maine July 24, 2024) (reversing ALJ's decision wherein he found the plaintiff's IC did not result in a more stringent RFC based on, *inter alia*, normal physical examinations); *Knepper v. Berryhill*, No. 17-cv-04838-VKD, 2019 WL 1440904, at *15 (N.D. Cal. Mar. 31, 2019) ("To the extent that the ALJ found unremarkable laboratory findings, [Plaintiff] argues, and the Commissioner does not appear to refute, that [IC] is a diagnosis of exclusion, based on symptoms, made only after ruling out other conditions," and "the ALJ does not explain how [unremarkable imaging studies and laboratory findings] relate to [Plaintiff's IC] condition.").

Further, the ALJ wholly failed to discuss Plaintiff's reports related to IC in June and November 2023, of feeling urgency to urinate and burning sensations, including during her medical appointments. (TR. 1160, 1179). She explained that the burning sensation

was worse during urination, she urinated every two to three hours during the day, and had to urinate one to three times during each night. (TR. 1160, 1179). The ALJ also did not address that during the November appointment, the physician prescribed a heparin bladder instillation and directed Plaintiff to "[c]all for appt for heparin bladder instillation and instillation self-administration teaching once she has medication in hand from pharmacy." (TR. 1181).

Although courts should not upset an ALJ's credibility determination that is closely and affirmatively linked to substantial evidence, the ALJ's conclusion that Plaintiff's pelvic, bladder, and urethra pain was controlled with medication is not supported by substantial evidence in the record. Overall, the ALJ's analysis was flawed both by her reliance on mischaracterizations of the evidence related to Plaintiff's daily activities, the longitudinal medical record related to IC symptoms, and/or failure to consider evidence disfavorable to a finding of disability. *See Winfrey v. Chater*, 92 F.3d 1017, 1021 (10th Cir.1996) ("[T]he ALJ's evaluation of plaintiff's subjective complaints was flawed by his reliance on factors that were not supported by the record and by his failure to consider other factors that were supported by the record."). Accordingly, the Court should reverse and remand, directing the ALJ to properly evaluate the evidence with respect to Plaintiff's subjective reports. In making this recommendation, the undersigned is not expressing an opinion as to the weight the Commissioner should give to Plaintiff's claims of pain and other symptoms, as that is an issue for the Commissioner to determine after properly evaluating the evidence and considering the relevant factors.

## VII.    RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned magistrate judge finds that the Commissioner's decision should be **REVERSED AND REMANDED**.

The parties are advised of their right to file specific written objections to this Report and Recommendation. 28 U.S.C. § 636; Fed. R. Civ. P. 72. Any such objections should be filed with the Clerk of the District Court by **April 1, 2025**. The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

## VIII.   STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED on March 18, 2025.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE